IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF D.M.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF D.M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

CHAAN W., APPELLANT, AND DIONDRAY M.,
APPELLEE AND CROSS-APPELLANT.


Filed July 18, 2023.    No. A-22-853.


Appeal from the Separate Juvenile Court of Douglas County: CANDICE J. NOVAK, Judge. Affirmed.

Andrea L. Hardesty, of Johnson & Pekny, L.L.C., for appellant.

Lindsey J. Stennis, Deputy Douglas County Attorney, for appellee State of Nebraska.

Thomas C. Riley, Douglas County Public Defender, and Claudia L. McKnight for appellee Diondray M.


BISHOP, ARTERBURN, and WELCH, Judges.

BISHOP, Judge.

## INTRODUCTION

Chaan W. appeals and Diondray M. cross-appeals from the decision of the separate juvenile court of Douglas County terminating their parental rights to their son, D.M. We affirm.

- 1 -

# BACKGROUND

## PROCEDURAL BACKGROUND

Chaan and Diondray are the parents of D.M., born in 2019. In July 2020, D.M. was removed from his home due to concerns of domestic violence between his parents.

On July 20, 2020, the State filed a petition alleging that D.M. was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because he lacked proper parental care by reason of the faults or habits of Chaan in that:

> A. Chaan . . . engaged in domestic violence with Diondray . . . in the presence of [D.M.].
> B. Chaan . . . has failed to provide proper parental care, support, supervision and/or safety for [D.M.].
> C. Chaan . . . has failed to provide safe, stable and/or appropriate [sic] for [D.M.].
> D. For the above reasons [D.M.] is at risk for harm.

That same day, the State filed a supplemental petition alleging that D.M. was a child within the meaning of § 43-247(3)(a) because he lacked proper parental care by reason of the faults or habits of Diondray in that:

> A. Diondray . . . is currently incarcerated.
> B. Diondray . . . engaged in domestic violence with Chaan . . . in the presence of [D.M.].
> C. Diondray . . . has failed to provide proper parental care, support, supervision and/or safety for [D.M.].
> D. Diondray . . . has failed to provide safe, stable and/or appropriate [sic] for [D.M.].
> E. For the above reasons [D.M.] is at risk for harm.

Additionally, the State filed ex parte motions for the immediate custody and pickup of D.M., asking that he be placed in the temporary custody of the Nebraska Department of Health and Human Services (DHHS) for placement in foster care or other appropriate placement, to exclude the homes of Chaan and Diondray. The juvenile court entered the ex parte custody orders that same day and D.M. has remained in foster care ever since.

In August 2020, D.M. was adjudicated to be within the meaning of § 43-247(3)(a) based on Chaan's admission to the allegations in parts A and D of the petition; the State dismissed parts B and C pursuant to a plea agreement. The matter proceeded to disposition and the juvenile court ordered Chaan to: have reasonable rights of agency supervised visitation with D.M. separate from Diondray's visitation, while maintaining appropriate interactions and meeting all of D.M.'s basic needs during the visits; work with family support services; maintain a stable and legal source of income and provide written verification thereof; maintain safe and stable housing and make it available upon request by a case manager for a walkthrough; successfully complete an approved parenting course; enroll in and successfully complete an accredited domestic violence program which includes foundation classes and batterer's intervention counseling; complete "Breaking the Cycle" class; and prepare a budget with DHHS or their contracted agent. Following a review and

permanency hearing in October, the juvenile court also ordered Chaan to enroll in and successfully complete an accredited domestic violence program which includes foundational counseling; complete a "full scale" psychological evaluation; and consistently cooperate with all case professionals. However, no longer appearing in the court's order were the requirements for Chaan to complete an approved parenting course and the "Breaking the Cycle" class, and to complete a budget.

In November 2020, D.M. was once again adjudicated to be within the meaning of § 43-247(3)(a), this time based on Diondray's no contest pleas to the allegations in parts C and E of the supplemental petition; the State dismissed parts A, B, and D pursuant to a plea agreement. The matter proceeded to partial disposition and the juvenile court ordered Diondray to: have reasonable rights of unsupervised visitation with D.M. with random drop-ins, while maintaining appropriate interactions and meeting all of D.M.'s basic needs during the visits; successfully complete a parenting class; successfully complete "Breaking the Cycle" class; complete an initial diagnostic interview (IDI); maintain safe and stable housing and make it available upon request by a case manager for a walkthrough; maintain a stable and legal source of income and provide written verification thereof; and enroll in and successfully complete an accredited domestic violence program which includes foundation classes and batterer's intervention counseling. Following a continued disposition hearing in December, the court also ordered that Chaan was not allowed to be present at Diondray's visits with D.M. No longer appearing in the court's order were the requirements for Diondray to complete a parenting class and the "Breaking the Cycle" class.

In February 2021, Diondray's visitation with D.M. was changed to supervised visitation and was to occur in a neutral location.

Following review and permanency hearings in February and August 2021, the juvenile court ordered Chaan to enroll in and successfully complete an accredited domestic violence program which includes foundational classes and batterer's intervention counseling; participate in family support services until discharged; maintain safe and stable housing and a legal source of income; complete a full scale psychological evaluation; consistently cooperate with all case professionals; follow all recommendations of the IDI to include individual therapy; and have reasonable rights of agency supervised visitation separate from Diondray. The February order also stated that Chaan was to successfully complete the "WCA Foundations" course.

Following a review and permanency hearing in September 2021, the juvenile court ordered Diondray to obtain and maintain safe and stable housing and a legal source of income; participate in individual therapy until successful discharge and follow all discharge recommendations; participate in supervised visitation; and not engage in any behavior that will lead to incarceration. Following another hearing in February 2022, Diondray was also ordered to participate in family support services until successfully discharged, complete a psychological evaluation, and have no contact with Chaan.

On January 21, 2022, the State filed motions to terminate Chaan's and Diondray's parental rights to D.M. pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that: Chaan and Diondray substantially and continuously or repeatedly neglected and refused to give the child the necessary parental care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the previous adjudication of the child; D.M. had been in an out-of-home placement for 15 or more months of the most recent

22 months; and termination of Chaan's and Diondray's parental rights was in the child's best interests.

In April 2022, the juvenile court, on a stipulated motion, modified Chaan's visitation with D.M. to allow the "foster mother/grandmother" to supervise visits rather than require agency supervision.

TERMINATION HEARING

The parental rights termination hearing was held over the course of three days, on April 22, July 25, and August 18, 2022. The State called several witnesses to testify, and numerous exhibits were received into evidence. Neither Chaan nor Diondray testified, but Chaan called one witness to testify on her behalf.

Mikayla Martins was D.M.'s case manager from September or October 2020 to October 2021. D.M. had been placed in the State's care in July 2020. When Martins took over the case, she staffed the case with the prior case manager and their supervisor; reviewed documentation completed by the prior case manager, court orders, and assessments; and met with Chaan and Diondray. Martins was asked about the reason for D.M.'s removal from the parental home. She said there was a domestic violence incident between Chaan and Diondray, when he was holding D.M., and that Chaan was the aggressor. Martins stated that more than one domestic violence incident occurred prior to D.M.'s removal, and he never returned to the care of either parent during Martins' time on the case.

According to a DHHS court report, on June 22, 2020, police responded to a domestic dispute and arrived to find Chaan on top of Diondray, punching him. When interviewed, Diondray reported that Chaan and her friends came to the home and tried to get inside, and she began attacking him while he was holding D.M., and he said his other children were present and witnessed the altercation. Chaan was arrested for third degree domestic assault and three counts of child abuse. A safety plan was put in place on July 7 wherein D.M. lived with Diondray, and Chaan was to have agency supervised visits. On July 18, law enforcement received a report of domestic violence between Chaan and Diondray. There were reports of property damage and that Diondray pulled braids out of Chaan's head, and as a result, Diondray was arrested and charged with third degree domestic assault.

During Martins' time on the case, Chaan never progressed past supervised visits with D.M. due to a lack of progress on her court orders, concerns about her criminal charges (she was incarcerated more than once for theft and domestic violence), and ongoing concerns of domestic violence. She completed "Breaking the Cycle," a parenting class, and a foundations class, and she started a batterer's intervention class, but Martins did not know if she completed it. Chaan did not complete the correct psychological evaluation. Chaan did complete an IDI in October 2020. According to a DHHS court report, she was diagnosed with "an adjustment disorder with disturbance of conduct due to problems with decision making and conflict resolution," and it was recommended that Chaan participate in individual therapy to address emotional regulation and decision making, and couple's counseling to work on communication and establishing healthy relationships. Martins testified that Chaan was not consistent with therapy. Chaan participated in one session of couple's counseling, but then she and Diondray did not go back. Martins did not believe Chaan had safe and stable housing. For a while Chaan lived with her mother. At some

point Chaan and Diondray got a house together, but then it was back and forth as to whether Chaan was living with Diondray--Chaan was not honest about whether she was living with Diondray or not. The lack of truthfulness about their living situation concerned Martins, as did the continued domestic violence between them. Towards the end of Martins' time on the case, Chaan said she was living with a friend.

During Martins' time on the case, Diondray progressed to unsupervised visits around November 2020. But visits went back to being supervised in February 2021 after a new intake came in about another one of Diondray's children. The incident happened in Diondray's home, when he was not there. Diondray had left two of his children (not D.M.) home alone with Diondray's 13-year-old brother, who Diondray knew engaged in criminal activities. According to Martins, Diondray's brother ended up shooting Diondray's son, which led to the removal of Diondray's other children. (According to a DHHS court report, Diondray's child was "shot in the hand by a drive by shooting.") So "it just wasn't appropriate to have another child of D.M.'s age in the house due to lack of supervision." Martins was concerned that Diondray, a convicted felon, had a firearm in his home. Additionally, Martins started getting concerned that Chaan was being allowed at the visits, even though she and Diondray were supposed to have separate visits.

At no point did Martins recommended liberalizing Diondray's visitation again because of "the lack of cooperation with the court orders, more domestic violence incidents happened, other criminal events happened"--"[h]e's been incarcerated a couple of times, too, in that time frame" for thefts and domestic violence--and he was dishonest about his relationship with Chaan. Diondray completed "Breaking the Cycle" and a parenting class. He did not complete batterer's intervention, telling Martins that he was working, had issues with his phone, and got kicked out of one of the virtual classes because somebody was in the car with him, and the class was supposed to be private. Martins had concerns about Diondray's attendance and/or compliance with therapy.

Chaan and Diondray "went back and forth all the time," and Martins "never really knew if they were or they weren't in a relationship." Martins was asked what concerns she would have if D.M. had been placed back in the home with his parents. She replied, "That he would be witness to domestic violence, due to his age he's not really able to communicate what is going on, the fact that he can't defend himself and that he can get hurt or even killed being in that situation." Additionally, domestic violence affects a child's well-being because it "doesn't create a healthy environment for a child," "[i]t doesn't promote good morals or how you're supposed to interact with people," and "[a]s a child gets older, they are more likely to engage in domestic violence themselves." Martins testified that the services provided to Chaan and Diondray did not correct the issues that led to D.M.'s removal. Martins opined that neither Chaan nor Diondray were fit to parent D.M., and that it was in D.M.'s best interests to terminate their parental rights.

Felicia Bonner was the case management supervisor assigned to D.M.'s case from July 15, 2021, through May 27, 2022. She was also the case manager and supervisor for Diondray's other children in another child welfare case during that same time. When Bonner first started on D.M.'s case, she had a transfer staffing and reviewed the court orders and service provider reports. During Bonner's time on the case, Chaan never progressed past agency supervised visits because of her inability to maintain D.M.'s safety. Bonner was concerned about Chaan's "ability or inability to maintain a safe environment, including not having violent situations or violent conversations [(with Diondray, mainly)] . . . around her child when someone wasn't watching." Bonner stated

that there were concerns about Chaan's ability to parent Diondray safely, even though there were no issues with the physical condition of her home. Bonner received reports of what Chaan was doing for income but was never able to verify the reports. Bonner did not know whether Chaan complied with the order to complete a psychological evaluation but stated that DHHS did not have a copy of any such evaluation. According to Bonner, Chaan had not been successfully discharged from therapy and had "not attended therapy for some time now." Chaan did complete domestic violence education classes combined with batterer's intervention in 2021, but "[e]ven after completion of that program . . . there's been several police reports involving domestic violence between Chaan and Diondray."

During Bonner's time on the case, Diondray's visitation with D.M. had been inconsistent, and he attended "half or less than half" of the visits that were scheduled when he was not incarcerated. Bonner never recommended that Diondray's visits progress beyond agency supervised visits. Diondray completed "Breaking the Cycle" and a parenting class in 2020, but there was continued domestic violence even after Diondray completed "Breaking the Cycle." Diondray did not complete a batterer's intervention course, and he was unsuccessfully discharged from individual therapy.

Carmen Cooks, a licensed independent mental health professional and certified professional counselor, testified that she is a behavior health therapist and that she provided services to Diondray. At the intake appointment on February 26, 2021, Diondray came in to establish therapy services for the current juvenile case, which involved domestic violence between him and Chaan. After Cooks conducted assessments of Diondray, they established weekly one-hour sessions. However, Diondray attended only 10 out of 34 scheduled sessions between February and November. When he did attend sessions, his engagement in services was "[i]nconsistent," "[m]ultiple times when he would show, he would be late," and "[s]ome days he would be focused on what's going on in his phone." When asked if Diondray ever told her the reasons he missed or was late to so many appointments, Cooks stated, "Yes," it was usually "transportation." Because of Diondray's attendance issues, therapy goals were not created until November.

Cooks stated that Diondray's treatment goals focused on "decision making and taking accountability, also following the recommendations of the court order to get his children back." When asked if any treatment goals related to domestic violence, Cooks responded, "No," because to her understanding "those were already worked out with his case worker" who "had him going through classes of some sort." On cross-examination, Cooks was asked why addressing domestic violence was not one of the treatment goals when Diondray told her that he had been referred because of domestic violence. Cooks responded, "That's not what he said he needed help with. I asked him why was he there, he said that his case worker sent him there due to the domestic violence concerns. He didn't . . . have concerns." On redirect, Cooks agreed that she would not have been able to address domestic violence with Diondray if he did not show up for therapy sessions.

Cooks never saw Diondray again after the treatment plan was created, and he was unsuccessfully discharged from her services due to his attendance and lack of engagement; his last session was on November 15, 2021.

Bonner testified that Diondray was incarcerated in January 2022 and remained incarcerated when she left D.M.'s case at the end of May. According to Bonner, Diondray's incarceration was a barrier to reunification because "D.M. has already been in care for two years, and there's a whole, we're what, 11 months out before [Diondray] would even be considered for release, and he hasn't been able to participate in any services to address the safety concerns."

Candice Gaines, the records and accounting manager at Douglas County Department of Corrections, testified that Chaan deposited money into Diondray's inmate account on February 2, 9, 16, and 24, 2022; records of those deposits were also received into evidence. Bonner said, "With the continued support that [Chaan] is offering [Diondray], it would be perceived that this relationship is going to continue, and so we would need to put services . . . in effect and see them making behavior changes and internalize those services together in order to determine whether or not they can be safe for [D.M.]."

Bonner testified that "it's one thing to complete court orders and check boxes and it's a whole nother [sic] thing to internalize the services offered and make actual behavior changes to make your home safe." She stated,

> [W]ith [D.M.] already being in care since 2020 and [Chaan and Diondray] have not progressed, . . . it's less likely that they are going to be able to do that in a time frame that is good for [D.M.'s] permanency and his well-being, and I think that at this point we have waited long enough for that progress to be made.

Bonner opined that neither Chaan nor Diondray were fit to parent D.M., and that it was in D.M.'s best interests to terminate their parental rights.

Officer Ryan Fitz, with the Omaha Police Department, testified that on March 22, 2021, he responded to a radio call for a disturbance at Diondray's residence. Officer Fitz said, "[Diondray] was very upset" and reported being involved in a disturbance at his house, as well as having some damage to property at his house. Officer Fitz recalled Diondray's statement regarding the incident.

> [Diondray] said that he was involved in a fight, he said that his child's mother showed up with some of her friends and essentially broke into the house and began assaulting him. He said that they used weapons and threatened to use a firearm, as well, or made a statement in regards to a firearm so he ended up having to defend himself to get them out of the house. He ultimately said that they left the house prior to our arrival and that about when we showed up it was when -- moments after they had left the house.

Diondray reported that he was struck in the head with a tire iron, causing visible injuries to his face, and he believed that Chaan was the person who struck him. During the investigation, a tire iron was located on the ground outside by the back door to the house. As for Diondray's property, he told Officer Fitz that the individuals kicked the front door in and broke exterior windows to the house, and there was also damage to his truck, which was parked in the driveway. Officer Fitz observed at least two shattered exterior windows and damage to a vehicle. No children were present during the incident. Officer Fitz was not able to speak to Chaan because she had a cut on her head that required stitches. Chaan was arrested as a result of the incident.

Officer Heidi Schlotzhauer, of the Omaha Police Department, testified that on October 29, 2021, she responded to a call for a disturbance/burglary at Diondray's residence. When Officer Schlotzhauer and her partner arrived, they could smell marijuana coming from the house and Diondray was intoxicated. He told them that Chaan had broken into his home. He and his brother had come home and found her in the residence (she had broken through the window) getting some of her belongings and she had a knife set with her. When they confronted her, she pulled out a knife and cut Diondray's hand, said "'don't mess with me,'" and then she left. Officer Schlotzhauer observed a small laceration on Diondray's left middle finger and she observed that the screen was off an open window; both the injury and the state of the window seemed consistent with Diondray's report. She said that Diondray did not want to file a police report because he had had too many contacts with the police and currently did not have custody of his children, and he felt that filing a report would negatively impact him getting his children back. Officer Schlotzhauer mentioned a protection order, but Diondray said he did not want to get one. When asked if Diondray was cooperative or uncooperative with her investigation, Officer Schlotzhauer replied, "Uncooperative." He refused to have the crime lab come out to document everything, and when she and her partner got her "DV camera," he refused to have any pictures taken.

Officer Michael Salseda, of the Omaha Police Department, testified that on January 12, 2022, he responded to a call about domestic violence at Chaan's apartment building. Officer Salseda observed Diondray in the parking area behind the building. Diondray "took off running" but was ultimately detained; it took four officers to handcuff Diondray, who had two felony warrants. When asked about Diondray's demeanor during the course of the investigation, Officer Salseda said, "It was varied, initially the arrest involved him running and resisting arrest, so he was kind of -- he appeared to be under the influence initially [(and subsequently admitted that he used PCP that morning)], and then he was making some various random statements," and "[l]ater when he calmed down he was significantly more coherent and cooperative after that." Diondray told the officers, "'[Y]ou need to check my house, they robbed my house.'" He also started talking about being hit in the face with a brick or a rock by Chaan. When Officer Salseda asked him what happened, Diondray said that Chaan was gone with his vehicle all day and he was upset and confronted her about that, and her response was that he was going to jail and then she hit him in the face with a brick. Officer Salseda observed scrapes and blood on Diondray's right cheek, injuries consistent with his face rubbing on the driveway as he resisted arrest. Diondray was arrested for the felony warrants and resisting arrest.

Detective Chris Perchal, with the Omaha Police Department, is assigned to the domestic violence unit squad. Detective Perchal testified that between January 2021 and February 2022, there were seven or eight reports of domestic violence between Chaan and Diondray, a "very high number for what we usually deal with." He reviewed all the reports and had to follow up on two of those reports. In November 2021, Detective Perchal contacted Diondray by phone to obtain more information about a report of a domestic violence assault by Chaan. Detective Perchal said that according to the police report, Diondray stated that Chaan came to his residence, retrieved a kitchen knife, and cut his left hand when a disturbance ensued, and that she also took his court-ordered GPS tracker and his cell phone. However, when Detective Perchal asked Diondray about the details of the assault, Diondray did not want to talk about the assault and stated that no assault had happened; the inconsistency was concerning to Perchal. Detective Perchal said that

Diondray changed the subject and only wanted to focus on the report that Chaan took his GPS tracker and phone because he had a warrant issued when he could not make his phone call. In January 2022, Detective Perchal unsuccessfully attempted to contact Diondray via phone and letter after Diondray filed a report stating that Chaan had taken his phone and used a cash app to make fraudulent purchases or transfer money.

Detective Perchal testified that of the seven or eight reports of domestic violence between Chaan and Diondray during the time frame noted above, Chaan was arrested more than once for domestic violence. He did not recall any children being present during the seven or eight incidents in the reports that he reviewed. But the detective said that when a child witnesses domestic violence, "they have a higher incident of possibly PTSD, reenacting the violence themselves as they get older, being desensitized to violent actions, and they are at risk of being assaulted themselves either on purposes or accidently during an assault."

Kandi Conley was D.M.'s foster mother from April 2021 to February 2022. Conley testified that D.M. did not exhibit any behavioral issues after visits with his parents. After visits with Chaan, D.M. came back with new clothes, shoes, and toys, and Chaan had always done his hair. Once or twice after a visit with Diondray, D.M. came back with new clothes. While D.M. was in their care, Conley and her husband scheduled all of D.M.'s medical appointments. They informed the case manager of the appointments, sometimes after the fact, but they did not know if Chaan and Diondray were subsequently informed of all appointments; Chaan did attend one eye appointment.

Chaan called Tyrome Charleston to testify on her behalf. Charleston, a DHHS case manager, testified that he was assigned to D.M.'s case on June 24, 2022. On August 1, Charleston referred Chaan for trauma therapy, and on August 5 he received an email that her case had been accepted.

JUVENILE COURT'S DECISION

In an order filed on October 28, 2022, the juvenile court terminated Chaan's and Diondray's parental rights to D.M. after finding that statutory grounds for termination existed pursuant to § 43-292(2), (6), and (7), and that termination of parental rights was in the child's best interests.

Chaan appeals and Diondray cross-appeals the juvenile court's order.

ASSIGNMENTS OF ERROR

Both Chaan on appeal, and Diondray on cross-appeal, assign, restated, that the juvenile court erred in finding (1) statutory grounds exist to terminate their parental rights under § 43-292, and (2) termination of their parental rights was in the child's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

ANALYSIS

STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Chaan's and Diondray's parental rights to D.M. under § 43-292(2), (6), and (7). The juvenile court found that all three of those grounds existed by clear and convincing evidence.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*.

D.M. was removed from his parents' care on July 20, 2020, and remained in foster care thereafter. By the time the motion to terminate parental rights was filed on January 21, 2022, D.M. had been in an out-of-home placement for 17 months. The 15-out-of-22 months' period was clearly satisfied.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Chaan's and Diondray's parental rights to D.M. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra*. We next consider whether termination is in the child's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Chaan and Diondray have failed to compete all court ordered requirements, and even though they completed at least some of the domestic violence programming, they have continued to engage in repeated instances of domestic violence. Both have been incarcerated on

more than one occasion during this juvenile case, and Diondray was currently incarcerated at the time of the termination hearing. Chaan and Diondray went back and forth on whether they were in a relationship or not, and case workers questioned their honesty about their relationship status. Chaan deposited money into Diondray's inmate account in 2022, which was indicative of a continued relationship of some sort.

Although Chaan and Diondray had provided for D.M.'s basic needs whenever they had visits with him, visits were inconsistent. Additionally, at the time of the termination hearing, both parents were still at a supervised visitation level because of concerns about domestic violence. Domestic violence and repeated incarcerations, and an overall inability to progress, were barriers to reunification. Both Martins and Bonner opined that neither Chaan nor Diondray were fit to parent D.M., and that it was in D.M.'s best interests to terminate their parental rights. We agree.

At the time the termination hearing concluded, D.M. had been in an out-of-home placement for nearly 25 months. And as the State points out, "Neither parent has made any significant, meaningful progress toward reunification, and there is no evidence presented to indicate any likelihood of significant [progress] in the near future." Brief for appellee State at 31. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. The State proved that Chaan and Diondray were unfit, meaning that each has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the child's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in D.M.'s best interests to terminate Chaan's and Diondray's parental rights.

CONCLUSION

For the reasons stated above, we affirm the orders of the juvenile court terminating Chaan's and Diondray's parental rights to D.M.

AFFIRMED.

- 11 -